# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Julie Freeman, Appellant/Respondent,

v.

J.L.H. Investments, LP, a/k/a Hendrick Honda of Easley, Respondent/Appellant.

Appellate Case No. 2014-000642

_____

Appeal From Pickens County
Doyet A. Early, III, Circuit Court Judge

_____

Opinion No. 27586
Heard April 8, 2015 – Filed November 4, 2015

_____

**AFFIRMED**

_____

Terry E. Richardson, James David Butler and Brady Ryan Thomas, all of Richardson, Patrick, Westbrook & Brickman, L.L.C., of Barnwell, A. Camden Lewis, of Lewis, Babcock & Griffin, L.L.P., of Columbia, Gedney M. Howe, III, of Gedney M. Howe, III, P.A., of Charleston, and Michael E. Spears, of Michael E. Spears, P.A., of Spartanburg, for Appellant/Respondent.

James Y. Becker and Mary McFarland Caskey, both of Haynsworth Sinkler Boyd, P.A., of Columbia, Sarah Patrick Spruill, of Haynsworth Sinkler Boyd, P.A., of Greenville, John T. Lay, of Gallivan, White & Boyd,

P.A., of Columbia, Marvin D. Infinger, of Nexsen Pruet, L.L.C., of Charleston, for Respondent/Appellant.

---

**JUSTICE BEATTY:**  Julie Freeman, individually and on behalf of 5,314 similarly situated car buyers, filed a lawsuit against J.L.H. Investments, LP, a/k/a Hendrick Honda of Easley ("Hendrick"), seeking damages under the South Carolina Dealers Act[1] (the "Dealers Act") on the ground that Hendrick "unfairly" and "arbitrarily" charged all of its customers "closing fees"[2] that were not calculated to reimburse Hendrick for actual closing costs.  A jury returned a verdict in favor of Freeman in the amount of $1,445,786.00 actual damages.  In post-trial rulings, the trial judge:  (1) denied Hendrick's motions to overturn or reduce the jury's verdict; (2) granted Freeman's motions to double the actual damages award and to award attorneys' fees and costs[3]; and (3) denied Freeman's motion for

---

[1]  The South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (the "Dealers Act") is codified at S.C. Code Ann. §§ 56-15-10 to -600 (2006 & Supp. 2014).  Section 56–15–40 provides in relevant part, "It shall be deemed a violation of paragraph (a) of § 56–15–30 for any manufacturer . . . distributor, wholesaler . . . or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties or to the public."  S.C. Code Ann. § 56-15-40(1) (2006); *see id.* § 56-15-30(a) ("Unfair methods of competition and unfair or deceptive acts or practices as defined in § 56-15-40 are hereby declared to be unlawful.").

[2]  S.C. Code Ann. § 37-2-307 (2015) (identifying the procedural requirements that motor vehicle dealers must satisfy before charging closing fees to customers but not the methodology for calculating the amount of the closing fee).

[3]  Section 56-15-110 of the Dealers Act provides in relevant part:

> (1) In addition to temporary or permanent injunctive relief as provided in § 56-15-40(3)(c), *any person* who shall be injured in his business or property by reason of anything forbidden in this chapter may sue therefor in the court of common pleas and *shall recover double the actual damages by him sustained*, and the cost of suit, *including a reasonable attorney's fee.*

> (2) When *such action is one of common or general interest to many persons or when the parties are numerous* and it is impracticable to

prejudgment interest. This Court certified this case from the Court of Appeals. We affirm.

## I.     Factual / Procedural History

In 2000, the South Carolina Legislature enacted the "Closing Fee" Statute as a provision within the South Carolina Consumer Protection Code ("SCCPC").[4] Act No. 387, 2000 S.C. Acts 3311, Part II, § 82. The "Closing Fee" Statute, which is codified at section 37-2-307 of the South Carolina Code, provides:

> Every motor vehicle dealer charging closing fees on a motor vehicle sales contract shall pay a one-time registration fee of ten dollars during each state fiscal year to the Department of Consumer Affairs. The closing fee must be included in the advertised price of the motor vehicle, disclosed on the sales contract, and displayed in a conspicuous location in the motor vehicle dealership.

S.C. Code Ann. § 37-2-307 (2015). In 2001, the South Carolina Department of Consumer Affairs (the "Department") issued a formal interpretation of this code provision and identified four procedural requirements that a motor vehicle dealer must meet before charging a closing fee to its customers.[5] Danny Collins, the

---

> bring them all before the court, *one or more may sue for the benefit of the whole*, including actions for injunctive relief.

S.C. Code Ann. § 56-15-110(1), (2) (2006) (emphasis added).

[4] The "South Carolina Consumer Protection Code" is codified in Title 37 of the South Carolina Code. S.C. Code Ann. §§ 37-1-101 to 37-29-130 (2015). "The purpose of the SCCPC is to clarify the law governing consumer credit and to protect consumer buyers against unfair practices by suppliers of consumer credit." *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 401, 472 S.E.2d 242, 244 (1996) (citing section 37-1-102 of the SCCPC).

[5] Administrative Interpretation 2.307-0101 provides in relevant part:

> The assessment of a "closing" or "documentation" fee (also occasionally denominated as an "administrative," "processing," or "procurement" fee) in a consumer credit sale of a motor vehicle is dependant [sic] on four factors: 1.) The dealer must pay the

Deputy for Regulatory Enforcement and General Counsel for the Department, explained that the Department generally accepts all registration forms submitted by the dealers, but does not establish the closing fee charged by the dealer.

On July 12, 2006, Freeman purchased a pre-owned vehicle from Hendrick. Hendrick charged Freeman a $299.00 closing fee that was pre-printed on the final sales invoice and identified as "PROCUREMENT FEE." Hendrick informed customers that it charged closing fees by posting a notice approved by the Department, which stated:

> THIS DEALERSHIP CHARGES A **$299.00** CLOSING FEE <u>AS [A] MEANS OF REIMBURSING IT FOR CERTAIN OVERHEAD COSTS SUCH AS DOCUMENT RETRIEVAL AND DOCUMENT PREPARATION</u>. IT IS A CHARGE THAT IS PERMITTED BUT NOT REQUIRED BY LAW. THE FULL CASH PRICE CHARGED AT ANY DEALERSHIP DEPENDS ON MANY FACTORS, INCLUDING ALL PRODUCTS AND SERVICES BOUGHT WITH THE VEHICLE. (Emphasis added).

Hendrick has consistently registered with the Department its intent to charge closing fees, which have ranged from $249 to $399.

---

> Department a registration fee each state fiscal year in the amount of ten ($10.00) dollars prior to the assessment of a closing fee; 2.) The existence of a closing fee must be disclosed on the sales contract; 3.) The closing fee must be disclosed in a statement displayed in a conspicuous location in the motor vehicle dealership; and 4.) If the closing fee is charged, and the vehicle is advertised, the closing fee must be included in the advertised price. A dealership may use the attached form to make its filling [sic] with the Department. A closing fee may only be assessed once these factors are met and the dealership has in its possession a date stamped copy of its disclosure stamped by the Department. The charging of a "closing," "documentation," or similar fees in connection with a consumer credit sale of a motor vehicle in the absence of any of these requirements constitutes the charging of an excess charge for Consumer Protection Code purposes.

After discussing her purchase with a friend, who is an attorney, Freeman initiated this action on August 29, 2006 against Hendrick.[6] In her Complaint, Freeman alleged, *inter alia*, that Hendrick violated the Dealers Act by charging closing fees that "were not for reimbursement of certain closing costs"[7] from August 29, 2002 to August 29, 2006. Specifically, Freeman claimed Hendrick's "charging of closing fees in violation of § 37-2-307 renders the fees illegal and in violation of the Dealers Act."

Subsequently, Hendrick filed motions seeking judgment on the pleadings and summary judgment. In these motions, Hendrick posited that it was entitled to judgment as a matter of law on the grounds that Freeman: (1) could not pursue a cause of action under the Dealers Act because section 37-5-202, which is located within the SCCPC, provides her exclusive remedy; (2) had not complied with the provisions of Rule 23, SCRCP[8] for class certification; and (3) was precluded from recovery based on the voluntary payment doctrine.

---

[6] Initially, the lawsuit was filed against multiple dealers some of whom settled, proceeded to trial, or were dismissed without prejudice pending the resolution of related lawsuits. This appeal only concerns the lawsuit against Hendrick.

[7] Freeman also alleged that Hendrick violated the "Closing Fee" Statute by failing to include the closing fees within the advertised price of its motor vehicles. However, at trial, the parties stipulated that this allegation was not a basis for the lawsuit.

[8] Rule 23 provides the following prerequisites for class certification:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if the court finds (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, (4) the representative parties will fairly and adequately protect the interests of the class, and (5) in cases in which the relief primarily sought is not injunctive or declaratory with respect to the class as a whole, the amount in controversy exceeds one hundred dollars for each member of the class.

Rule 23(a), SCRCP.

During the pre-trial proceedings, the trial judge adopted several rulings that were issued in a case similar to the one brought by Freeman. In particular, the judge interpreted "closing fee," which is undefined in section 37-2-307 or any other code provision, to mean: "A 'closing fee' is a pre-determined set fee for the reimbursement of closing costs, such as document retrieval and document preparation, *but only those actually incurred by the dealer and necessary to the closing transaction*." (Emphasis added).

Ultimately, the judge denied Hendrick's pre-trial motions and the case proceeded to trial. A jury returned a verdict in favor of Freeman in the amount of $1,445,786.00 actual damages. Both parties filed post-trial motions. In her motions, Freeman sought an award of prejudgment interest, double the amount of actual damages, and attorneys' fees and costs under the Dealers Act. Hendrick moved for judgment notwithstanding the verdict ("JNOV") and, alternatively, a new trial *nisi remittitur*. Following a hearing, the trial judge denied Hendrick's motions, granted Freeman's motion for double actual damages, and denied Freeman's motion for prejudgment interest. The parties agreed to a consent order providing that Freeman was entitled to an established amount of attorneys' fees and costs contingent on the outcome of this appeal.

The parties filed cross-appeals to the Court of Appeals. This Court granted Freeman's unopposed motion to certify this case pursuant to Rule 204(b), SCACR.

## II.    Discussion

In the interest of logical progression, we have grouped Hendrick's eight issues into those that were raised during (1) pre-trial, (2) trial, and (3) post-trial. We have also incorporated into the post-trial category the issue raised by Freeman in her cross-appeal.

## A.    Pre-Trial Issues

Hendrick contends that "[t]his case should never have reached the trial phase as a 'group action' under the Dealers Act." Specifically, Hendrick claims that: (1) Freeman was precluded from pursuing an action under the Dealers Act because her exclusive remedy for an alleged closing fee violation was under the SCCPC; (2) the class action proceeding was impermissible because Freeman failed to plead or prove the prerequisites for class certification under Rule 23, SCRCP; (3) the trial judge misinterpreted the term "closing fee" to mean that a dealer may only charge a closing fee that equates to the actual costs incurred by a dealer during closing; (4)

procedural compliance with the "Closing Fee" Statute is sufficient to absolve a dealer from an alleged violation; and (5) Freeman waived her claim by voluntarily paying the closing fee.

## 1. Cause of Action Under the Dealers Act

As a threshold matter, we find that Freeman pursued the proper course of action in seeking recovery for a closing fee violation under the Dealers Act. Although the "Closing Fee" Statute identifies the procedural requirements that must be met before a dealer can charge a closing fee, neither the "Closing Fee" Statute nor other provisions of the SCCPC provide any remedy for a consumer claiming a closing fee violation.

As stated by this Court, "[t]he purpose of the SCCPC is to clarify the law governing consumer credit and to protect consumer buyers against unfair practices by suppliers of consumer credit." *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 401, 472 S.E.2d 242, 244 (1996) (citing section 37-1-102 of the SCCPC); *see Davis v. NationsCredit Fin. Servs. Corp.*, 326 S.C. 83, 86, 484 S.E.2d 471, 472 (1997) ("One of the primary purposes of the Consumer Protection Code is to 'protect consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit, having due regard for the interests of legitimate and scrupulous creditors.' " (quoting section 37-1-102(2)(d))).

Despite the well-defined purpose to protect against unfair practices involving consumer credit transactions, Hendrick identifies several provisions in the SCCPC as potential avenues for recovery.[9] However, none of these are applicable to the type of claim brought by Freeman. A review of these code sections reveals that the remedies are directed at recovery for specifically identified acts involving lending transactions between creditors and debtors. Here, Freeman did not allege any unfair practice regarding the financing of her vehicle purchase. Rather, she claimed she was unfairly charged a "closing fee" that bore no relation to the actual expenses incurred by Hendrick. Given this claim did not involve an unfair consumer credit transaction between a creditor and a debtor, Freeman had no means of recovery under the SCCPC. Instead, Freeman's claim fell within the purview of the Dealers Act, which: (1) prohibits a motor vehicle dealer from engaging "in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties or to the public;" and (2) provides a

---

[9] *See* S.C. Code Ann. § 37-5-202(2), (3), (8) (2015) (identifying effect of creditor's violations of the SCCPC on the rights of a consumer).

remedy for a consumer that is damaged by this action.  S.C. Code Ann. §§ 56-15-40(1), -110(1), (2) (2006).

Furthermore, because the Legislature enacted the SCCPC and the Dealers Act both for the purpose of consumer protection, the statutes cannot be read in isolation.  *See Tilley v. Pacesetter Corp.*, 355 S.C. 361, 378, 585 S.E.2d 292, 300 (2003) ("The Consumer Protection Code and the Dealers Act share a common purpose:  protection of the consumer."); *see also Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011) ("A statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers.").  Considering this common purpose, we believe the Legislature intended for the statutes to be construed together as it expressly provided for the SCCPC to supplement remedies afforded to consumers in law and equity, which would necessarily include those provided in the Dealers Act.  *See* S.C. Code Ann. § 37-1-103 (2015) ("Unless displaced by the particular provisions of this title, the Uniform Commercial Code and the principles of law and equity, including the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause *supplement its provisions*." (emphasis added)).

Consequently, in reconciling the two statutes, we find that the "Closing Fee" Statute sets forth the procedural requirements that a dealer must satisfy before charging a closing fee whereas the Dealers Act sets forth the remedy for an alleged "closing fee" violation.  *See Hodges v. Rainey*, 341 S.C. 79, 88, 533 S.E.2d 578, 583 (2000) ("Statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative.").

Significantly, the Department's Administrative Interpretation, when read in full, supports this construction as it references provisions of the Dealers Act and indicates that the "Closing Fee" Statute was not intended to be a comprehensive remedy.  The Administrative Interpretation states:

> The Supreme Court specifically indicated in its holding in *Fanning* that it did not imply such fees might not be actionable under other applicable law.  322 S.C. at 404, 472 S.E.2d at 245, N.8.  Likewise, the General Assembly did not further clarify the issue other than to indicate the fees might be legally charged for Consumer Protection Code purposes if the requisite filing and disclosures are made.  The Department is aware of nothing in the General Assembly's

enactment that legitimizes a closing fee or any fee or charge if it is assessed through fraud or misrepresentation.

Because the Department is charged with executing the "Closing Fee" Statute, we must give credence to its interpretation. *See Faile v. S.C. Emp't Sec. Comm'n*, 267 S.C. 536, 540, 230 S.E.2d 219, 221-22 (1976) ("The construction of a statute by the agency charged with executing it is entitled to the most respectful consideration and should not be overruled without cogent reasons.").

Finally, we note that our appellate courts have, in other contexts, rejected the assertion that the remedies found within the SCCPC are the exclusive remedy for a violation of consumer transactions. *See Tilley v. Pacesetter Corp.*, 333 S.C. 33, 508 S.E.2d 16 (1998) (holding that consumers, who purchased home products secured by a mortgage on their homes, were not limited to the remedy under section 37-5-202 of the SCCPC because the Legislature did not specifically provide that this code section was the exclusive remedy). Our appellate courts have also implicitly approved proceeding under the Dealers Act for an alleged closing fee violation. *See Gardner v. Newsome Chevrolet-Buick, Inc*. 304 S.C. 328, 404 S.E.2d 200 (1991) (reversing, in a case pre-dating the enactment of the "Closing Fee" Statute, trial judge's denial of class certification for car buyers' suit alleging dealer committed an "unfair act" in charging a closing fee in violation of the Dealers Act). Accordingly, we conclude that Freeman properly pursued recovery under the Dealers Act.[10]

## 2. Class Action Lawsuit

With respect to Hendrick's claim regarding class certification, we find that Freeman's decision to proceed under the provisions of the Dealers Act rather than Rule 23 of the South Carolina Rules of Civil Procedure was permissible and does not warrant the granting of a new trial to Hendrick.

---

[10] Even if we assume that Hendrick is correct in its averment that the SCCPC provides the sole remedy for Freeman, we question what would happen in cases of cash or non-credit financed sales. Taken to its logical extreme, a person who did not use credit financing to purchase a vehicle would have no method of recovery for a violation of the "Closing Fee" Statute. We do not believe the Legislature intended to leave these consumers without a remedy. By enacting the Dealers Act, the Legislature clearly sought to protect all automobile purchasers regardless of the method of purchase.

Although the South Carolina Rules of Civil Procedure are broadly worded to apply to "all suits of a civil nature,"[11] Rule 23 is not necessarily applicable to class action lawsuits brought under the Dealers Act. As previously stated, the Legislature enacted section 56-15-110(2) of the Dealers Act to create a statutory right for a person to sue in a representative capacity. Clearly, at the time the Legislature enacted section 56-15-110(2), it was aware of the existence of the general class action statute codified in section 15-5-50. *See Whitner v. State*, 328 S.C. 1, 6, 492 S.E.2d 777, 779 (1997) (recognizing the basic presumption that the Legislature has knowledge of previous legislation). Notably, the language of section 56-15-110(2) mirrors that of section 15-5-50.[12] By enacting nearly identical provisions, we believe the Legislature intended for the statutes to operate independently. If the Legislature deemed section 15-5-50 sufficient to cover all class action lawsuits, it would have been unnecessary to incorporate identical language into section 56-15-110(2). We believe the inclusion of the class action language in section 56-15-110(2) was a purposeful decision by the Legislature to create an alternative method for a consumer to sue in a representative capacity under the Dealers Act.

After Rule 23 was adopted to replace section 15-5-50,[13] the Legislature did not repeal section 56-15-110(2). By leaving intact section 56-15-110(2), we believe the Legislature intended to provide those harmed by violations of the Dealers Act a specific procedural avenue to pursue their claims. The adoption of

---

[11] *See* Rule 1, SCRCP (providing that the South Carolina Rules of Civil Procedure "govern the procedure in all South Carolina courts in all suits of a civil nature whether cognizable as cases at law or in equity, with the exceptions stated in Rule 81").

[12] *See* S.C. Code Ann. § 15-5-50 (1976) (repealed 1985)("When the question is one of common or general interest to many persons or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole."); *id.* § 56-15-110(2) (2006) ("When such action is one of common or general interest to many persons or when the parties are numerous and it is impracticable to bring them all before the court, one or more may sue for the benefit of the whole, including actions for injunctive relief.").

[13] Act No. 100, 1985 S.C. Acts 277 (adopting South Carolina Rules of Civil Procedure on July 1, 1985).

Rule 23, as a general procedural rule, cannot operate to eliminate the statutory right found in section 56-15-110(2).

Moreover, we discern no conflict between Rule 23 and section 56-15-110(2). While the requirements for class certification in Rule 23 are expressly enumerated, we interpret subsection (2) of section 56-15-110 to be the functional equivalent of the Rule 23 requirements. Similar to the provisions of Rule 23, section 56-15-110(2) authorizes a consumer to sue in a representative capacity if the following prerequisites are met: (1) the action is one of common or general interest; (2) the class is so numerous that it would be impracticable to bring them all before the court; and (3) the representative party can obtain relief for the benefit of the class as a whole. Accordingly, we conclude that Rule 23 and section 56-15-110(2) present independent, alternative methods for which a claimant may, in a representative capacity, pursue a cause of action under the Dealers Act on behalf of those similarly situated.

Even assuming that Rule 23 is applicable, the facts of the instant case satisfied the prerequisites of this rule. In his order denying Hendrick's post-trial motions, the trial judge found: (1) the lawsuit involved common claims on behalf of a large number of purchasers; (2) the testimony established that Freeman's claim was typical of every other customer's claim regarding the payment of a closing fee; and (3) the parties provided notice to all of the affected customers and provided a sufficient time period to allow those customers to opt out of the lawsuit. We agree with these findings and would add that the amount in controversy for each claimant exceeded $100 as Hendrick registered closing fees ranging from $249 to $399. Therefore, we conclude the class action lawsuit was properly brought under the Dealers Act. *Cf. Gardner*, 304 S.C. at 331, 404 S.E.2d at 202 (recognizing, in a case pre-dating the "Closing Fee" Statute, car buyers' suit seeking recovery under the Dealers Act against car dealer for charging a closing fee met all the class certification requirements of Rule 23).

### 3. Effect of Procedural Compliance

Having found that the class action lawsuit was proper, we hold that Hendrick was not entitled to judgment as a matter of law simply because the Department accepted Hendrick's closing fee registration form. Essentially, Hendrick contends its procedural compliance with the "Closing Fee" Statute, as interpreted by the

Department and this Court in *Fanning*,[14] effectively absolved it from any liability via the Filed Rate Doctrine,[15] the Good Faith Error Defense,[16] and the Safe Harbor Defense.[17]

Freeman does not dispute that Hendrick complied with the procedural requirements of the "Closing Fee" Statute.[18] However, meeting these procedural

---

[14] *See Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 472 S.E.2d 242 (1996) (holding, in a case pre-dating the "Closing Fee" Statute, "Procurement Fee" was not an "unauthorized fee" or "unconscionable" under the SCCPC but, rather, was an element of the negotiated price of the vehicle).

[15] *See Edge v. State Farm Mut. Auto. Ins. Co.*, 366 S.C. 511, 517, 623 S.E.2d 387, 391 (2005) ("The filed rate doctrine stands for the proposition that because an administrative agency is vested with the authority to determine what rate is just and reasonable, courts should not adjudicate what a reasonable rate might be in a collateral lawsuit." (citation omitted)).

[16] S.C. Code Ann. § 37-5-202(7) (2015) ("A creditor may not be held liable in an action *brought under this section* for a violation of this title if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid the error." (emphasis added)).

[17] S.C. Code Ann. § 37-6-506(3) (2015) ("No provision of this title or of any statute to which this title refers which imposes any penalty on any creditor shall apply to any act done, or omitted to be done, in conformity with any rule or regulation so adopted, amended or repealed or in conformity with any written order, opinion, interpretation or statement of the Commission or of the administrator, notwithstanding that such rule, regulation, order, opinion, interpretation or statement may, after such act or omission, be amended, or rescinded or be determined by judicial or other authority to be erroneous or invalid for any reason."); *see id.* § 37-6-104(4) ("Except for refund of an excess charge, no liability is imposed under this title for an act done or omitted in conformity with a rule of the administrator notwithstanding that after the act or omission the rule may be amended or repealed or be determined by judicial or other authority to be invalid for any reason.").

requirements only entitled Hendrick to charge a closing fee. As testified by Danny Collins, the Department neither determines the amount of the fee nor reviews the dealer's financial records to evaluate how the amount was calculated. Notably, Collins stated that "[i]t's pretty much just a registration." Moreover, the "Closing Fee" Statute does not require a dealer to inform the Department of the amount of its closing fee nor does it empower the Department to approve or disapprove the amount of a closing fee. Rather, as acknowledged by Collins, the Department is "simply charged with the day-to-day enforcement of the procedural portions of the Closing Fee Statute." Because the Department is not vested with the authority to determine a reasonable "closing fee," the Filed Rate Doctrine does not apply to bar Freeman's claim. Additionally, Hendrick does not claim that it made a bona fide error in calculating the amount of the closing fee.

Furthermore, neither the Good Faith Error Defense nor the Safe Harbor Defense, codified at sections 37-5-202(7) and 37-6-506(3) respectively, provides Hendrick immunity from liability as these code sections only apply to consumer credit transactions brought under Title 37 of the SCCPC. Here, Freeman brought this action pursuant to section 56-15-40 of the Dealers Act and not under the SCCPC.

Although procedural compliance with the "Closing Fee" Statute enabled Hendrick to charge a closing fee, it was still required to accurately assess the amount of the fee charged because, as noted in *Fanning*, these fees may be attacked on grounds "such as claims for fraud, misrepresentation or unfair trade practices." *Fanning*, 322 S.C. at 404 n.8, 472 S.E.2d at 245 n.8.

### 4. Definition of "Closing Fee"

The trial judge interpreted "closing fee" to mean: "A 'closing fee' is a predetermined set fee for the reimbursement of closing costs, such as document retrieval and document preparation, but only those actually incurred by the dealer and necessary to the closing transaction." Hendrick challenges this definition primarily by differentiating between the definitions of the word "fee" and "cost."

Hendrick contends that "[g]iven the ordinary definition of fee, the proper construction of the [Closing Fee] Statute is that a closing fee is simply a fee

---

[18] The parties stipulated that the remaining procedural requirement was not at issue because Freeman did not purchase her vehicle as the result of seeing a publicized advertisement.

charged at closing for services rendered by a dealership."  Hendrick further asserts that the term "cost" in the context of the "Closing Fee" Statute "would refer to the amount of money a dealer is required to expend to perform the services it provides to a customer at closing, and to otherwise comply with the disclosure, documentation, and record retention requirements imposed under state and federal law."  For reference, Hendrick cites to several statutes from other jurisdictions where the state legislature expressly directed how a closing fee should be determined.  Because our Legislature failed to provide specific directives regarding the amount of the fee, what can be included in the fee, and how the fee should be set, Hendrick maintains the "Closing Fee" Statute is effectively a disclosure statute that is administered by the Department.

For several reasons, we agree with the trial judge's definition of the term "closing fee" and conclude that it did not render the "Closing Fee" Statute unconstitutionally vague[19] or require prospective application.[20]  Because this term is undefined in the "Closing Fee" Statute, the judge properly looked to the usual and customary meaning of the term "fee".  *See Branch v. City of Myrtle Beach*, 340 S.C. 405, 409-10, 532 S.E.2d 289, 292 (2000) ("When faced with an undefined statutory term, the Court must interpret the term in accord with its usual and customary meaning.").

While we recognize the difficulty a dealer may face in determining the exact amount of a specific purchaser's closing fee prior to closing, we agree with the trial judge's interpretation that the amount charged must bear some relation to the actual

---

[19] *See S.C. Dep't of Soc. Servs. v. Michelle G.*, 407 S.C. 499, 506, 757 S.E.2d 388, 392 (2014) ("[A]ll the Constitution requires is that the language convey sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices."(quoting *Curtis v. State*, 345 S.C. 557, 572, 549 S.E.2d 591, 599 (2001))); *Curtis v. State*, 345 S.C. 557, 572, 549 S.E.2d 591, 599 (2001) (recognizing that an undefined term in a statute does not automatically render the statute unconstitutionally vague (citing *State v. Hamilton*, 276 S.C. 173, 276 S.E.2d 784 (1981))).

[20] *See Toth v. Square D Co.*, 298 S.C. 6, 8, 377 S.E.2d 584, 585 (1989) ("The general rule regarding retroactive application of judicial decisions is that decisions creating new substantive rights have prospective effect only, whereas decisions creating new remedies to vindicate existing rights are applied retrospectively. Prospective application is required when liability is created where formerly none existed." (citations omitted)).

expenses incurred for the closing.[21] As stated in language recommended by the Department, Hendrick posted a notice that it charged a closing fee "as a means of reimbursing it for certain overhead costs such as document retrieval and document preparation." By notifying customers that it sought to be reimbursed, Hendrick clearly communicated that the closing fee was intended to be repayment for that which was expended. *See Black's Law Dictionary* 1157 (5th ed. 1979) (defining "reimburse" to mean "to pay back, to make restoration, to repay that expended, to indemnify; or make whole").

Notwithstanding this notice, Hendrick failed to offer any evidence that it calculated the costs that comprised the closing fee. When questioned as to how Hendrick arrived at the closing fee, Don Pendleton, the General Manager, testified that he "didn't sit there and do the math," he was not sure about the actual costs of retrieving and preparing documents for closing, and he did not know "the exact charge." Further, Pendleton believed that Hendrick was "limited to seeking reimbursement for [Hendrick's] closing costs." Pendleton also acknowledged that he did not know how the original $199 closing fee was determined and that Hendrick's subsequent increases in the amount charged for the closing fee were not tied to Hendrick's costs.

Although Hendrick's expert, Michael Thompson, testified regarding the average closing cost per year, he admitted that he did not see anything to suggest that Hendrick did any kind of analysis at the time Hendrick set the closing fee. Moreover, in calculating the average closing cost, Thompson included expenses for the salaries of finance and sales managers, the building, utilities, and "outside services." All of these are general operating expenses and not directly tied to the closing of a motor vehicle sale. If a motor vehicle dealer wishes to be compensated for these expenses, it may include them as part of the overall purchase price of a vehicle. However, by specifically delineating a "closing fee" from the purchase price of the vehicle, the dealer must account for the costs that comprise this fee. Without such an accounting, a dealer is charging a consumer an additional amount that is not directly related to the expenses incurred in closing the sale of a motor vehicle but is, nevertheless, identified as a closing fee. We find that such practice effectively circumvents the purpose of the "Closing Fee" Statute and the Dealers Act, which is, in part, to protect consumers from charges that are above the advertised price listed by the dealer.

---

[21] If the Legislature disagrees, it is free to correct our interpretation and specifically direct how a dealer determines the amount of a closing fee.

Thus, although we agree with Hendrick that the "Closing Fee" Statute is a disclosure statute and the Department serves as a repository for the required filings, we find that the "Closing Fee" Statute does more than require disclosure of the "closing fee." It also requires that the "closing fee" be included in the advertised price in order to avoid unexpected, additional costs for the purchase of an automobile.

Consequently, we affirm the trial judge's definition of "closing fee." We emphasize that a "closing fee" is not limited to expenses incurred for document preparation, retrieval, and storage. However, any costs sought to be recovered by a dealer under a closing fee charge must be directly related to the services rendered and expenses incurred in closing the purchase of a vehicle. Given that each vehicle purchase is different, compliance with the "Closing Fee" Statute does not require that the dealer hit the "bull's-eye" for each purchase. While each sale may be different, it is inconceivable that each closing requires performance of dissimilar tasks. To the contrary, the category of tasks required to close a sale is the same in every sale. However, the number of times a certain task is performed may differ. As a result, a dealer may comply with the statute by setting a closing fee in an amount that is an average of the costs *actually incurred* in all closings of the prior year.

### 5.  Voluntary Payment Doctrine

We also disagree with Hendrick's reliance on the voluntary payment doctrine as a complete defense. Freeman acknowledged that the "Procurement Fee" in an amount of $299 was identified on her sales contract and that she paid this amount at the time of purchase. However, Freeman paid the closing fee without full knowledge of what comprised the fee. In fact, even if Freeman had inquired, no Hendrick employee could have explained how Hendrick arrived at this amount. Accordingly, we find that Hendrick's reliance on the voluntary payment doctrine is misplaced. *See Hardaway v. S. Ry. Co.*, 90 S.C. 475, 488-89, 73 S.E. 1020, 1025 (1912) ("It is an elementary principle that no action will lie to recover money *voluntarily paid with full knowledge of all the facts*" and "without any fraud, duress, or extortion" to make such payment. (emphasis added)).

Based on the foregoing, we agree with the trial judge that none of the affirmative defenses or arguments asserted by Hendrick entitled it to judgment as a matter of law prior to trial.

## B.   Trial Issues

Even if the class action lawsuit was properly tried and submitted to the jury, Hendrick asserts the trial judge erred with respect to the jury charge.  Initially, Hendrick claims the judge erred in refusing to charge its proposed instructions on the following:  (1) the Good Faith Error and Safe Harbor Defenses identified in the SCCPC; (2) the voluntary payment doctrine, waiver, and estoppel; and (3) a claimant's duty to read the contract under which she seeks to recover.  Hendrick further argues that the judge erred in declining to charge Hendrick's proposed instruction warning the jury against awarding speculative damages.  Hendrick also challenges the propriety of the judge's charge on the definitions of:  (1) a "closing fee"; and (2) what constitutes an "unfair, "arbitrary," or "unconscionable" action for purposes of the Dealers Act.   Finally, Hendrick contends that the judge erred in submitting a general verdict form to the jury rather than the special verdict form proposed by Hendrick.

### 1.  Jury Charge

We find the trial judge did not abuse his discretion in charging the jury.  *See Cole v. Raut,* 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008) ("An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court committed an abuse of discretion.").  Based on our review of Hendrick's proposed jury instructions, the charges were another attempt to assert its pre-trial arguments.

Hendrick requested that the judge charge the Safe Harbor Defense, the Good Faith Error Defense, the voluntary payment doctrine, waiver, estoppel, and the duty of a claimant to read the subject contract.  As previously discussed, Hendrick was precluded as a matter of law from relying on the Safe Harbor Defense, the Good Faith Error Defense, and the voluntary payment doctrine.  Thus, the trial judge properly refused to charge these requests.

By the same reasoning, we find the remaining charges of waiver, estoppel, and the duty of a claimant to read the subject contract were inapplicable as Freeman paid the closing fee without knowledge of what comprised the amount of the fee.  Therefore, we discern no reversible error as to the judge's refusal to charge Hendrick's requests.  *See Wells v. Halyard,* 341 S.C. 234, 237, 533 S.E.2d 341, 343 (Ct. App. 2000) ("A trial court must charge the current and correct law."); *see also Pittman v. Stevens,* 364 S.C. 337, 340, 613 S.E.2d 378, 380 (2005) ("A trial court's

refusal to give a properly requested charge is reversible error only when the requesting party can demonstrate prejudice from the refusal.").

Furthermore, reviewing the jury charge as a whole, the judge charged the current and correct law and any alleged error did not result in prejudice to Hendrick. *See Keaton ex rel. Foster v. Greenville Hosp. Sys.,* 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999) ("In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." (citation omitted)). As previously discussed, the judge properly defined the term "closing fee" by its usual and customary meaning. Moreover, the judge's instructions regarding an "arbitrary," "bad faith," or "unconscionable" action were consistent with the applicable statutes and case law interpreting these statutes. *See deBondt v. Carlton Motorcars, Inc.*, 342 S.C. 254, 263, 536 S.E.2d 399, 404 (Ct. App. 2000) (defining "bad faith" and "arbitrary" under the Dealers Act; discussing "arbitrary," "bad faith," and "unconscionable" conduct under the Dealers Act). The judge's instructions also covered the substance of Hendrick's requests to charge.

Additionally, despite Hendrick's challenge to the judge's definition of an "unfair" act, we discern no error as the judge's instruction was based on a specific provision of the Dealers Act that declares "unfair" acts to be unlawful and case law defining the term "unfair." *See* S.C. Code Ann. § 56-15-30(a) (2006) ("Unfair methods of competition and unfair or deceptive acts or practices as defined in § 56-15-40 are hereby declared to be unlawful."); *Gentry v. Yonce*, 337 S.C. 1, 12, 522 S.E.2d 137, 143 (1999) (defining an "unfair" act as "when it is offensive to public policy or when it is immoral, unethical, or oppressive"), *overruled on other grounds by Proctor v. Whitlark & Whitlark, Inc.*, Op. No. 27580 (S.C. Sup. Ct. filed Oct. 7, 2015) (Shearouse Adv. Sh. No. 39 at 46).[22]

---

[22] Hendrick takes issue with the trial judge utilizing case law involving the South Carolina Unfair Trade Practices Act ("SCUTPA") to define the term "unfair." Because this term is undefined in the Dealers Act, the judge properly looked to this case law as SCUTPA is modeled after the language of the Federal Trade Commission Act and, thus, was appropriate for interpretation. *See* S.C. Code Ann. § 56-15-30(b) (2015) ("In construing paragraph (a) the courts may be guided by the definitions in the Federal Trade Commission Act (15 U.S.C. 45)."); *see also State v. Ortho-McNeil-Janssen Pharm., Inc.*, Op. No. 27502 (S.C. Sup. Ct. filed July 8, 2015) (Shearouse Adv. Sh. No. 26 at 8) (recognizing that the language in SCUTPA is modeled after the Federal Trade Commission Act; noting the FTC Policy Statement on Unfairness provides the following general characteristics of an unfair practice claim "(1) whether the practice injures consumers; (2) whether it violates

With respect to the judge's charge on damages, we find the judge accurately charged the jury on how to arrive at an amount of damages and specifically instructed the jury that it had discretion to award a value of $0 up to the full amount of the charged closing fee. Thus, even though the judge declined to charge Hendrick's instruction warning the jury against awarding speculative damages, the charge was correct and did not result in prejudice to Hendrick. Accordingly, even giving credence to Hendrick's claim that portions of the charge were incomplete or erroneous, we find that Hendrick was not prejudiced because the charge as a whole was reasonably free from error.

## 2. Verdict Form

Finally, we find the judge did not abuse his discretion in refusing to submit Hendrick's proposed special verdict form to the jury. *See Butler v. Gamma Nu Chapter of Sigma Chi*, 314 S.C. 477, 483, 445 S.E.2d 468, 471 (Ct. App. 1994) ("The question of whether to grant a party's request for a special verdict form is a matter committed to the sound discretion of the trial court."); *see also S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 300-01, 641 S.E.2d 903, 906 (2007) (recognizing that trial judge has discretion to determine how a case is submitted to the jury).

The jury was tasked with answering the narrow question of whether Hendrick charged an improper amount as its closing fee in violation of the Dealers Act. Contrary to the first question on the special verdict form proposed by Hendrick, there was no dispute that Hendrick complied with the procedural requirements of the "Closing Fee" Statute. Furthermore, the judge properly charged the jury regarding the "Closing Fee" Statute, the Dealers Act, and the award of damages. We would also note that the exhibit submitted by Freeman regarding actual damages broke down the amount of closing costs charged per year, which was similar to the third question on Hendrick's proposed verdict form. Thus, we conclude that the general verdict form was sufficient. Accordingly, we find that Hendrick was not prejudiced by the trial judge's refusal to submit the special verdict form to the jury. *See Steele v. Dillard*, 327 S.C. 340, 343, 486 S.E.2d 278, 280 (Ct. App. 1997) ("Error in the refusal to submit special interrogatories or special issues to the jury will constitute ground for reversal only if prejudice results to the complaining party." (quoting 5A C.J.S. *Appeal & Error* § 1762(b), at 1136 (1958))).

established public policy; (3) whether it is unethical or unscrupulous." (emphasis added) (footnote and citation omitted)).

**C.     Post-Trial Issues**

Hendrick contends the judge erred in denying its motion for JNOV and, alternatively, a new trial *nisi remittitur*.  Hendrick further argues that the judge erred in doubling the jury's award of actual damages.

### 1.  JNOV / New Trial *Nisi Remittitur*

In its JNOV motion, Hendrick essentially reiterated all of its pre-trial arguments that were rejected by the judge.  Furthermore, as the basis for its motion for new trial *nisi remittitur*, Hendrick claimed the verdict should have been reduced to only those damages incurred by Freeman and not the other members of the class.

Having rejected Hendrick's arguments regarding pre-trial issues, we discern no errors of law for which to reverse the judge's denial of Hendrick's motions.  *See Clark v. S.C. Dep't of Pub. Safety*, 362 S.C. 377, 382-83, 608 S.E.2d 573, 576 (2005) (noting that an appellate court will reverse the trial court's ruling on a directed verdict motion or JNOV motion only where there is no evidence to support the ruling or where the ruling is controlled by error of law); *Waring v. Johnson,* 341 S.C. 248, 256, 533 S.E.2d 906, 910 (Ct. App. 2000) ("The grant or denial of a motion for a new trial *nisi* rests within the discretion of the trial judge and his decision will not be disturbed on appeal unless his findings are wholly unsupported by the evidence or the conclusions reached are controlled by error of law.").

Furthermore, viewing the evidence in the light most favorable to Freeman, there is evidence to support the judge's denial of Hendrick's motions for a direct verdict and JNOV as the evidence yielded more than one reasonable inference regarding the cause of action under the Dealers Act.  *See RFT Mgmt. Co., L.L.C. v. Tinsley & Adams, L.L.P.*, 399 S.C. 322, 331-32, 732 S.E.2d 166, 171 (2012) ("When reviewing the trial court's ruling on a motion for a directed verdict or a JNOV, this Court must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party.").

Freeman offered evidence that Hendrick charged closing fees on every vehicle sold between August 29, 2002 and August 29, 2006.  As stipulated by the parties, Hendrick collected $1,445,786 in closing fees from 5,314 car buyers during the relevant time period.  Despite notifying customers that the closing fee

was a "means of reimbursing it for certain overhead costs such as document retrieval and document preparation," there was no evidence presented that Hendrick calculated what accounted for the amount of the charged closing fee. Randy Watkins, Hendrick's Vice-President of Transaction Compliance, acknowledged that it would be unfair for a dealership to charge a closing fee that was not tied to the actual closing costs. Without evidence that the closing fee constituted an amount directly related to the closing of a vehicle, the jury could have reasonably found that Hendrick's actions were arbitrary and unfair. Additionally, the jury could have reasonably found that Freeman and the other similarly situated car buyers were damaged as these consumers paid a closing fee that was not equal to the actual closing costs incurred by Hendrick. Finally, as stated in the judge's instructions, the jury was given discretion to award an amount between $0 and the full amount of the closing fee. The jury's decision to award the full amount of the closing fees is supported by the evidence. Accordingly, we find that the trial judge properly denied Hendrick's post-trial motions.

## 2. Double Award of Actual Damages

Additionally, we conclude the judge properly doubled the jury's award of actual damages as subsection (1) of section 56-15-110 expressly provides that a person who recovers under the Dealers Act "shall" recover double the actual damages sustained. *See Wigfall v. Tideland Utils., Inc.*, 354 S.C. 100, 111, 580 S.E.2d 100, 105 (2003) ("The term 'shall' in a statute means that the action mandatory.").

As previously discussed, subsection (2) of section 56-15-110 authorizes a person to sue in a representative capacity. Here, Freeman brought the action individually and on behalf of all other affected customers. The jury awarded actual damages in an amount equal to the closing fees charged to all Hendrick customers between 2002 and 2006. Because an award of double actual damages is statutorily mandated, whether the amount is awarded by the jury or the judge during post-trial proceedings is inconsequential. Thus, we affirm the judge's decision to double the award of actual damages. *See Gardner v. Newsome Chevrolet-Buick, Inc.*, 304 S.C. 328, 331, 404 S.E.2d 200, 202 (1991) (recognizing that section 56-15-110 "mandates the court to double actual damages as a statutory award to a prevailing plaintiff"); *cf. Adams v. Grant*, 292 S.C. 581, 358 S.E.2d 142 (Ct. App. 1986)

(holding that jury properly doubled actual damages awarded to car buyer under section 56-15-110(1) of the South Carolina Code).[23]

### 3. Prejudgment Interest

In her cross-appeal, Freeman avers the judge erred in declining to award her prejudgment interest in addition to the award of actual damages. Although Freeman is correct that prejudgment interest is statutorily authorized by the provisions of section 34-31-20 of the South Carolina Code,[24] Freeman's damages were not liquidated or ascertainable at the time the class action claim arose. Because Freeman's theory of the case was that she paid a closing fee that was not equal to the actual closing costs, her actual damages could have been a portion of the fee that exceeded the actual closing costs. As a result, the judge properly denied Freeman's motion for prejudgment interest. *See S. Welding Works, Inc. v. K & S Constr. Co.,* 286 S.C. 158, 164, 332 S.E.2d 102, 106 (Ct. App. 1985) (recognizing that the law allows prejudgment interest on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty).

### III.   Conclusion

Based on the foregoing, we affirm the rulings of the trial judge and the verdict rendered by the jury.

**AFFIRMED.**

**TOAL, C.J., and HEARN, J., concur. KITTREDGE, J., dissenting in a separate opinion in which Acting Justice James E. Moore, concurs.**

---

[23]  As its final issue, Hendrick asserts the judge erred in awarding Freeman attorneys' fees and costs. However, as previously noted, the parties agreed to a consent order providing that Freeman would be awarded an established amount of attorneys' fees and costs if she prevailed on appeal.

[24]  S.C. Code Ann. § 34-31-20 (Supp. 2014).

**JUSTICE KITTREDGE:** I respectfully dissent. As a matter of law, there was no violation of the Closing Fee Statute.[25] I would reverse the $2,891,572 verdict against J.L.H. Investments, LP, also known as Hendrick Honda.

**I.**

The General Assembly enacted the Closing Fee Statute in 2000. Prior to the passage of that statute, automobile dealers routinely included in the price of a vehicle a closing fee, sometimes referred to as a procurement fee. In 1996, this Court addressed a challenge to a dealer-imposed $87 closing fee in *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 472 S.E.2d 242 (1996). The Fannings claimed, among other things, that the closing fee violated the South Carolina Consumer Protection Code (SCCPC), which makes up title 37 of the South Carolina Code. *Id.* at 401, 472 S.E.2d at 244. We rejected the Fannings' claim, reasoning that, because the fee "was charged to all of Fritz's customers in establishing total cash price," it was "an element of the negotiated cash price of the vehicle." *Id.* at 402, 472 S.E.2d at 244. The Fannings' unconscionability claim was similarly rejected.[26] *Id.* at 403, 472 S.E.2d at 245.

The legislature responded to our decision in *Fanning* by adding the Closing Fee Statute to the SCCPC. The Closing Fee Statute provides:

> Every motor vehicle dealer charging closing fees on a motor vehicle sales contract shall pay a one-time registration fee of ten dollars during each state fiscal year to the Department of Consumer Affairs. The closing fee must be included in the advertised price of the motor vehicle, disclosed on the sales contract, and displayed in a conspicuous location in the motor vehicle dealership.

S.C. Code Ann. § 37-2-307 (2015). In implementing the statute, the South Carolina Department of Consumer Affairs (Department) issued an "Administrative Interpretation" on June 7, 2001, setting forth the process and guidelines for automobile dealers to follow to ensure compliance with the statute:

---

[25] S.C. Code Ann. § 37-2-307 (2015).

[26] The *Fanning* Court nonetheless noted that its holding did "not imply that inclusion of such fees may not be attacked on other grounds, such as claims for fraud, misrepresentation[,] or unfair trade practices." *Fanning*, 322 S.C. at 404 n.8, 472 S.E.2d at 245 n.8.

The assessment of a "closing" or "documentation" fee (also occasionally denominated as an "administrative," "processing," or "procurement" fee) in a consumer credit sale of a motor vehicle is depend[e]nt on four factors: 1.) The dealer must pay the Department a registration fee each state fiscal year in the amount of ten ($10.00) dollars prior to the assessment of a closing fee; 2.) The existence of a closing fee must be disclosed on the sales contract; 3.) The closing fee must be disclosed in a statement displayed in a conspicuous location in the motor vehicle dealership; and 4.) If the closing fee is charged, and the vehicle is advertised, the closing fee must be included in the advertised price. A dealership may use the attached form to make its filing with the Department. A closing fee may only be assessed once these factors are met and the dealership has in its possession a date stamped copy of its disclosure stamped by the Department. The charging of a "closing," "documentation," or similar fee[] in connection with a consumer credit sale of a motor vehicle in the absence of any of these requirements constitutes the charging of an excess charge for Consumer Protection Code purposes.

S.C. Dep't of Consumer Affairs, Administrative Interpretation 2.307-0101, at 1 (2001).

It is undisputed that Hendrick Honda complied with the Department's Administrative Interpretation in every respect. Hendrick Honda: (1) timely paid the registration fee; (2) disclosed the closing fee on its sales contracts; (3) displayed the notice of a closing fee in a conspicuous place in the dealership; and (4) included the closing fee in the advertised price of each of its vehicles. The Department annually authorized Hendrick Honda to charge a closing fee, not to exceed a designated amount. Having complied with the Department's Administrative Interpretation, there can be no liability under the SCCPC. *See* S.C. Code Ann. § 37-6-104(4) ("Except for refund of an excess charge, no liability is imposed under this title for an act done or omitted in conformity with a rule of the administrator notwithstanding that after the act or omission the rule may be . . . determined by judicial or other authority to be invalid for any reason."); *id.* § 37-6-506(3) ("No provision of this title or of any statute to which this title refers which imposes any penalty on any creditor shall apply to any act done, or omitted to be done, in conformity with any rule or regulation so adopted, amended[,] or repealed or in conformity with any written order, opinion, interpretation[,] or statement of the Commission [on Consumer Affairs] or of the administrator, notwithstanding that such rule, regulation, order, opinion, interpretation[,] or statement may, after

such act or omission . . . be determined by judicial or other authority to be erroneous or invalid for any reason."). Unlike the majority, I would give efficacy to the legislature's placement of the Closing Fee Statute in the SCCPC. While Julie Freeman's Complaint seeks recovery for an alleged violation of the Dealers Act,[27] she concedes there can be no violation of the Dealers Act without a violation of the Closing Fee Statute found in the SCCPC. Because there has been no violation of the Closing Fee Statute, I would reverse the judgment against Hendrick Honda.

## II.

While my disposition of the appeal would not require further analysis, I add the following in response to the majority opinion.

As noted, all of the statutory and Department-imposed requirements of the Closing Fee Statute were satisfied when Freeman purchased her Honda Accord from Hendrick Honda. Freeman testified to the negotiation of the car's purchase price and acknowledged she was fully aware that price included a $299 closing fee. In fact, far from feeling she had been taken advantage of, Freeman testified that she "was very happy at the time [she] bought the car." Nonetheless, Freeman, individually and purportedly on behalf of other similarly aggrieved customers of Hendrick Honda, parlayed this transparent, "happy" vehicle purchase into an approximately $3,000,000 judgment.

Regarding the amount of a closing fee, the Department has provided little guidance. The Administrative Interpretation issued by the Department merely included a sample form dealers could use to provide notice to customers of the fee, which the form describes "as a means of reimbursing [the dealer] for certain overhead costs such as document retrieval and document preparation." S.C. Dep't of Consumer Affairs, *supra*. The sample notice goes on to inform consumers that the amount of the fee "depends on many factors, including all products and

---

[27] *See* S.C. Code Ann. §§ 56-15-10 to -600 (2006 & Supp. 2014) (commonly referred to as the Dealers Act). Among other things, the Dealers Act prohibits "unfair or deceptive acts or practices." *Id.* § 56-15-30(a) (2006). This includes "any action which is arbitrary, in bad faith, or unconscionable." *Id.* § 56-15-40(1). Freeman points to the alleged violation of the Closing Fee Statute in the SCCPC to establish this "arbitrary" and "unconscionable" conduct. However, Hendrick Honda did not violate the Closing Fee Statute. There has thus been no arbitrary or unconscionable conduct upon which to base a claim for a violation of the Dealers Act.

services bought with the vehicle." *Id.* Suffice it to say, neither the terms of the statute nor the Department's guidance represent a model of clarity. However, two certainties emerge concerning the Closing Fee Statute.

First, as noted above, dealers are given little guidance in determining what costs may or may not be included in a closing fee. This lack of guidance is at odds with ideal legal frameworks, which are designed to provide reasonably discernable and objective criteria. In my view, the absence of known objective criteria renders it difficult to characterize a dealer's closing fee as arbitrary. On the other hand, I acknowledge that the absence of known objective criteria should not be a license for dealers to charge a disguised profit. The legislature, whether by design or not, has entrusted the Department with the role of protecting consumers from such charges by requiring Department approval of dealers' requests to charge closing fees. And, contrary to the majority's suggestion, the Department does not merely rubber-stamp those requests. *See id.* at 2 ("Forms considered to be deceptive or to misstate the law will be rejected by the Department."). Specifically, Danny Collins, General Counsel and then-Deputy of Regulatory Enforcement for the Department, testified to the Department's rejection of an excessive closing fee request and indicated that the Department closely scrutinized others.

Second, it is axiomatic that a closing fee must be predetermined, thus rendering it impossible for the fee to equal the actual closing costs associated with a particular transaction. I reject as meritless the trial court's determination that the legislature intended the predetermined closing fee to equal the dealer's precise closing costs in unknown, future transactions.

Even assuming Freeman may pursue a claim under the Dealers Act, a new trial would nevertheless be warranted due to the trial court's erroneous construction of the Closing Fee Statute. While the trial court initially and properly found that a closing fee was of necessity predetermined, it further paradoxically found the closing fee must equal the actual dealer costs incurred in the transaction.[28] This latter erroneous finding, and the resulting jury instructions based on it, effectively required the jury to return a verdict in favor of Freeman. This becomes readily apparent upon reading excerpts from those instructions. Regarding the definition of a closing fee, the court charged the jury:

---

[28] Because the closing fee is predetermined, it will, at best, only approximate actual closing costs.

The dealer may only charge the buyer closing costs that are actually incurred and are a necessity to the closing[,] thus reimbursing the dealer for actual closing costs incurred.  That is the definition that I charge you is the law in this case defining what a closing fee is under the statute . . . .

. . . If you determine that the costs charged [were] a closing fee under the statute and under the definition, that would pretty much be the end of your inquiry, because [the defendant] had complied with the law.  If, however, you determine that it is not a closing fee, that the costs were not in connection with the closing of the transaction, as defined [how] I just said, then you have to decide whether or not [the defendant] has violated what we call the Dealers Act.

In the damages portion of the charge, the requirement that the closing fee must equal actual closing costs was made with even greater clarity:

[I]f the [d]efendant's closing fees exceeded the amount to necessarily reimburse the [d]efendant for his actual closing costs, then actual damages [are] a portion of that fee which exceeded the actual closing costs.  So if you find that [the plaintiff is] entitled to damages, obviously you've got a wide range in this case, anywhere from zero to two hundred ninety-nine dollars.

Hendrick Honda, of course, never contended that its closing fee mirrored the actual closing costs incurred in each transaction.  By charging the jury that every cent of the closing fee had to be justified by a concomitant cost, Hendrick Honda was essentially charged out of court.[29]

The majority joins me in rejecting the trial court's construction of the Closing Fee Statute and related jury instructions, which required the closing fee to exactly match the actual closing costs in each transaction.  The majority freely

---

[29]  Hendrick Honda presented expert testimony that its average closing costs greatly *exceeded* the amount of the closing fee.  The expert testified that, in 2006, when Freeman purchased her Honda, Hendrick Honda's average closing costs were $507.96, well above the $299 closing fee.  No one has ever suggested the impossible—that Hendrick Honda incurred zero closing costs.  Yet that is what the jury found.  I believe this glaring error is the result of the burden being effectively placed on Hendrick Honda, despite the boilerplate language in the jury charge that the plaintiff has the burden of proof.

acknowledges that "compliance with the 'Closing Fee' Statute does not require that the dealer hit the 'bull's-eye' for each purchase." I therefore do not understand the majority's insistence on upholding this jury verdict, which was based on an erroneous jury instruction that required the closing fee to equal the "actual closing costs incurred."

In sum, the legislature placed the Closing Fee Statute in the SCCPC, the provisions of which control the outcome of this case. I would reverse the trial court judgment on the basis of Hendrick Honda's compliance with the Department's Administrative Interpretation of those provisions. Moreover, even if I accepted the potential for a Dealers Act violation under these circumstances, the erroneous jury instruction would mandate reversal and remand for a new trial with a proper construction of the Closing Fee Statute, one that does not require the predetermined closing fee to equal the "closing costs that are actually incurred and are a necessity to the closing," as the trial court charged the jury. Not only were Hendrick Honda's actions not prohibited by statute, they were specifically approved. Under the Court's ruling today, Hendrick Honda is being punished for doing exactly what South Carolina law permitted it to do.

**Acting Justice James E. Moore, concurs.**