# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

South Carolina Department of Consumer Affairs,
Appellant,

v.

Cash Central of South Carolina LLC, Respondent.

Appellate Case No. 2017-002639

———————

Appeal from Richland County
Robert E. Hood, Circuit Court Judge

———————

Opinion No. 5855
Heard October 14, 2020 – Filed September 1, 2021

———————

### REVERSED

———————

James Cochran Copeland and Kelly Hunter Rainsford,
both of the South Carolina Department of Consumer
Affairs, of Columbia, for Appellant.

James Y. Becker and Mary M. Caskey, both of
Haynsworth Sinkler Boyd, PA, of Columbia; and Sarah
P. Spruill, of Haynsworth Sinkler Boyd, PA, of
Greenville, for Respondent.

———————

**LOCKEMY, C.J.:**  The South Carolina Department of Consumer Affairs (the Department) appeals the circuit court's order granting final judgment in favor of Cash Central of South Carolina, LLC (Cash Central) as to the Department's allegations that it failed to comply with sections 37-3-201 and 37-3-305 of the

South Carolina Consumer Protection Code (the SCCPC).[1]  The Department argues the circuit court erred by finding Cash Central was not required to refund excess charges to consumers because it substantially complied with the posting and filing requirements of sections 37-3-201 and 37-3-305 and established the bona fide error and excusable neglect defenses of sections 37-3-201(6) and 37-5-202(7) of the SCCPC.  We reverse.

## FACTS/PROCEDURAL HISTORY

Cash Central is an internet-based lender that provides short- and medium-term consumer loans ranging from $750 to $5,000.  It is a wholly owned subsidiary of Direct Financial Solutions, LLC (Direct Financial), which, in turn, is a wholly owned subsidiary of Community Choice Financial, Inc. (Community Choice).  Cash Central had no employees but instead used those of Direct Financial and Community Choice.  In February 2013, Community Choice began preparing to do business in South Carolina, and in September 2013, Cash Central submitted two applications for supervised lender licenses—one for Cash Central and one for "www.cashcentral.com"—to the South Carolina Board of Financial Institutions (the Board).  The Board issued two supervised lender licenses to Cash Central on October 2, 2013.  Cash Central's website went live on October 23, 2013.  From October 23, 2013, until April 10, 2015, Cash Central made 15,000 loans to South Carolina consumers, including 1,642 loans with loan finance charges over 239.99% APR.[2]

The Board audited Cash Central in March 2015 and informed Cash Central on April 3, 2015, that it had failed to file and post a maximum rate schedule.  On April 10, 2015, Cash Central filed a maximum rate schedule with the Department, delineating a maximum rate of 246.9% APR.  The Department determined Cash Central failed to file or post a maximum rate schedule from October 24, 2013, until April 10, 2015.  The Department then brought this action against Cash Central on behalf of South Carolina consumers pursuant to section 37-6-113(A) of the SCCPC[3] for violation of sections 37-3-201 and 37-3-305 of the SCCPC and sought a refund of excess charges.

---

[1] S.C. Code Ann. § 37-3-201 (2015); S.C. Code Ann. § 37-3-305 (Supp. 2020); *see generally* §§ 37-1-101 to 37-29-100 (2015 & Supp. 2020).
[2] An annual percentage rate (APR) is the sum of the interest rate and other finance charges, calculated on a yearly basis and expressed as a percentage.
[3] § 37-6-113(A) ("[T]he administrator may bring a civil action against . . . a person subject to this title to recover actual damages sustained and excess charges paid

The circuit court held a trial on the matter. At trial, James Copeland, then-acting commissioner of the Board, testified that when the Board issued a supervised lending license, it would send the license to the business's headquarters along with a letter stating that the lender must file and post its maximum rate schedule. Carolyn Grube-Lybarker, of the Department, testified supervised lenders must file a maximum rate schedule with the Department before they can assess finance charges in excess of 18% APR.

Assistant general counsel for Community Choice, Rebecca Fox, was responsible for ensuring Community Choice complied with state law when it began business in a new state. To accomplish this, she created a "compliance outline" specific to each state. To make the outline, Fox downloaded state statutes, visited websites, and summarized the information. She confirmed she obtained a copy of a "guide for business" from the Department's website and acknowledged this document discussed the maximum rate schedule. Fox stated she saved this and other documents pertaining to compliance with South Carolina law to her electronic file during the first week of February 2013. She could not recall if she realized two regulatory agencies oversaw supervised lenders in South Carolina or that Cash Central was required to file a maximum rate schedule with a different agency.

Fox testified that after Cash Central made its first loan, she reviewed the loan documents, compared them to her outline, and discovered Cash Central had failed to post the maximum rate schedule or the 127-word disclosure on its website.[4] Fox informed Cash Central's head of marketing of these discrepancies. Cash Central then added the 127-word statutory disclosure and posted the rate schedule showing eight different APRs based on loans of $1,000; $2,000; and $4,000. The website included a calculator feature, which allowed the user to adjust the terms and amount of the loan to view different rates based on those factors. Fox believed the rate schedule on the website satisfied the posting requirement but agreed the website did not state the maximum rate was 246.64%.

Todd Jensen, CEO of Direct Financial, admitted that between October 23, 2013, and April 10, 2015, the maximum APR did not appear on the website, and he

by . . . consumers who have a right to recover explicitly granted by this title."); § 37-5-202(2) ("A consumer is not obligated to pay a charge in excess of that allowed by this title and has a right of refund of any excess charge paid.").
[4] *See* § 37-3-305(3) (providing a 127-word disclosure that must be included with the posted rate schedule).

agreed the schedules Cash Central provided on its website did not provide the applicable rates for a $750 loan. He stated a consumer could use the loan calculator to determine the maximum APR but a consumer would have to enter forty-two possible variations to determine the highest possible APR. Jensen acknowledged Cash Central collected $11 million in interest on the loans it made between October 2013 and April 2015.

Cash Central presented the testimony of an expert in the field of consumer and firm behavior in household-financial settings, who opined the rate calculator on Cash Central's website provided consumers with more "salient and timely" information than the static disclosure that section 37-3-305 required.

The circuit court found subsection 37-5-202(7) excused Cash Central's admitted failure to file the maximum rate schedule. Next, it found Cash Central substantially complied with sections 37-3-201 and 37-3-305 because its website's disclosures "better promote[d] the purposes of [s]ection 37-3-305 than the [m]aximum [r]ate [s]chedule issued by the Department." In addition, the circuit court concluded any monetary liability for Cash Central's failure to file was strictly limited by the provisions of section 37-3-201(6) because its failure to file was a good faith error and qualified as excusable neglect. It further found section 37-3-201(6) must apply to initial failures to file to avoid the absurd result of requiring Cash Central to recast its loans to 0% APR. However, the circuit court ordered Cash Central to pay a civil penalty of $5,000 under section 37-3-201(6) for each of the three years it failed to file its maximum rate schedule with the Department. This appeal followed.

**ISSUES ON APPEAL**

1. Did the circuit court err by finding Cash Central was not required to refund excess charges to consumers because it substantially complied with the filing and posting requirements of sections 37-3-201 and 37-3-305?

2. Did the circuit court err by finding Cash Central was not required to refund excess charges to consumers pursuant to the bona fide error defenses of sections 37-3-201(6) and 37-5-202(7)?

**STANDARD OF REVIEW**

"Statutory interpretation is a question of law subject to de novo review." *Barton v. S.C. Dep't of Prob. Parole & Pardon Servs.*, 404 S.C. 395, 414, 745 S.E.2d 110,

120 (2013). This court is free to decide questions of law without any deference to the circuit court. *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011).

**LAW/ANALYSIS**

**I. Filing and Posting Requirements of Sections 37-3-201 and 37-3-305**

The Department argues Cash Central was not authorized to charge more than 18% APR pursuant to section 37-3-201 because it never filed its maximum rate schedule with the Department. The Department contends that when construed in light of the SCCPC's primary purpose of protecting consumers, sections 37-3-201(2) and 37-6-113(A) do not require a consumer to pay—or allow a creditor to retain—an excess charge. The Department therefore asserts the charges in excess of 18% APR that Cash Central collected between October 24, 2013, and April 10, 2015, were excess charges in violation of 37-3-201(2), and as a matter of law, it was required to return the excess charges collected to consumers. We agree.

"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). "Whe[n] the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Id.*

"A court should not consider a particular clause in a statute in isolation, but should read it in conjunction with the purpose of the entire statute and the policy of the law." *Peake v. S.C. Dep't of Motor Vehicles*, 375 S.C. 589, 599, 654 S.E.2d 284, 290 (Ct. App. 2007). "A statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers. In interpreting a statute, the language of the statute must be read in a sense that harmonizes with its subject matter and accords with its general purpose." *Sparks v. Palmetto Hardwood, Inc.*, 406 S.C. 124, 128, 750 S.E.2d 61, 63 (2013) (quoting *Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011)). "General and special statutes should be read together and harmonized if possible. But to the extent of any conflict between the two, the special statute must prevail." *Criterion Ins. Co. v. Hoffmann*, 258 S.C. 282, 293, 188 S.E.2d 459, 464 (1972).

"[T]he purpose of the SCCPC is to clarify the law governing consumer credit and to protect consumer buyers against unfair practices by suppliers of consumer credit." *Freeman v. J.L.H. Invs., LP*, 414 S.C. 362, 373, 778 S.E.2d 902, 907

(2015) (quoting *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 401, 472 S.E.2d 242, 244 (1996)); *see also Camp v. Springs Mortg. Corp.*, 310 S.C. 514, 516, 426 S.E.2d 304, 305 (1993) ("The purpose of SCCPC is to protect consumers."). The SCCPC must be "liberally construed and applied to promote its underlying purposes and policies." *See* § 37-1-102(1)-(2) (setting forth the policies of the SCCPC, which include "protect[ing] consumer[s] . . . against unfair practices by some suppliers of consumer credit" as well as "provid[ing] rate ceilings to assure an adequate supply of credit to consumers," "further[ing] consumer understanding of the terms of credit transactions," and "foster[ing] competition among suppliers of consumer credit so that consumers may obtain credit at [a] reasonable cost").

A supervised lender is an organization authorized to make supervised loans. § 37-3-501(2); § 37-1-301(20). A supervised loan is "a consumer loan in which the rate of the loan finance charge exceeds twelve percent per year as determined according to the provisions on the loan finance charge for consumer loans (Section 37-3-201)." § 37-3-501(1); § 37-3-109(1) (defining a loan finance charge as the sum of all charges payable by the debtor and imposed by the lender "as an incident to the extension of credit, including . . . interest"). A supervised lender may contract for and receive a loan finance charge "(b) on loans with a cash advance exceeding six hundred dollars . . . [at] any rate *filed and posted* pursuant to Section 37-3-305; *or* (c) *on loans of any amount, eighteen percent per year on the unpaid balances of principal*. § 37-3-201(2) (emphases added).

In October 2013, subsections 37-3-305(1)-(3) provided:

> (1) Every creditor . . . making supervised or restricted consumer loans . . . in this State shall . . . on or before the date the creditor begins to make such loans in this State, file with the Department . . . and . . . post in one conspicuous place in every place of business, if any, in this State in which offers to make consumer loans are extended, a certified maximum rate schedule meeting the requirements set forth in subsections (2), (3), and (4). . . .

> (2) The rate schedule required to be filed and posted by subsection (1) must contain a list of the maximum rate of loan finance charge . . . stated as an annual percentage rate . . . that the creditor intends to charge for consumer

credit transactions in each of the following categories of
credit:

(a) unsecured personal loans;

. . . .

(3) The rate schedule that is filed by the creditor shall be
reproduced in at least fourteen-point type for posting as
required by subsection (1).  The terms "Loan Finance
Charge" and "Annual Percentage Rate" will be printed in
larger size type than the other terms in the posted rate
schedule. . . .

(4) A rate schedule filed and posted as required by this
section shall be effective until changed in accordance
with this subsection.  A creditor wishing to change any of
the maximum rates shown on a schedule previously filed
and posted . . . shall file with the Department . . . and
shall post as required by subsection (1) a revised
schedule of maximum rates.  The revised schedule shall
be certified and returned to the creditor if properly
filed. . . .

S.C. Code Ann. § 37-3-305(1)-(4) (2015).[5]  We apply the foregoing language in
our analysis because it was the law in effect during the filing and posting periods at
issue in this matter.

---

[5] In 2016, the legislature made several changes to these subsections; the revisions
now provide that after the supervised lender files a rate schedule with the
Department, the Department will issue a maximum rate schedule containing the
items required by subsections (2), (3), and (4), which the lender must post.  In
addition, subsection (3) now provides the Department will reproduce the rate
schedule provided by the creditor "in at least fourteen-point type for posting as
required by subsection (1)."  S.C. Code Ann. § 37-3-305(1)-(3) (Supp. 2020).
Subsection (4) provides a creditor seeking to revise a schedule must submit the
revised schedule to the Department, which will issue the revised schedule, which
the creditor must then post in accordance with subsection (1).  S.C. Code Ann.
§ 37-3-305(4) (Supp. 2020).

In 2013, the statutory requirement that a supervised lender file a maximum rate schedule with the Department was already in effect. *See* § 37-3-305(1) (2002). Subsection 37-3-305(2), which remains unchanged, required the schedule to "contain a list of the maximum rate of loan finance charge . . . stated as an annual percentage rate . . . that the creditor intends to charge for consumer credit transactions in . . . unsecured personal loans." Subsection 37-3-305(7) provided that a creditor making supervised loans must file a maximum rate schedule with the Department by January 31 of each state fiscal year. S.C. Code Ann. § 37-3-305(7) (Supp. 2020) (amended by 2016 Act No. 244 to redesignate former paragraph (8) as paragraph (7)). If the creditor fails to do so by January 31, any maximum rate schedule previously filed with the Department would be deemed ineffective, "and the maximum credit service charge that the creditor may impose on any credit extended after that date *may not exceed eighteen percent a year* until such time as the creditor files a revised maximum rate schedule that complies with this section." *Id.* (emphasis added).

We find the plain language of sections 37-3-201(2) and 37-3-305 requires that a supervised lender intending to charge rates above 18% APR file and post its maximum rate. Unless and until it complies with this requirement, such lender is not authorized to contract for or receive finance charges in excess of 18% APR.

## II. Defenses

Next, we consider whether the circuit court erred in finding Cash Central was not required to refund excess charges because it (1) substantially complied with these statutory requirements and (2) established the defense of bona fide error pursuant to sections 37-3-201(6) and 37-5-202(7).

## A. Substantial Compliance

The Department argues the defense of substantial compliance did not apply to Cash Central's failure to satisfy sections 37-3-201 and 37-3-305. It next asserts that even if it did apply, section 37-3-305 required lenders to file *and* post the maximum rate schedule, and Cash Central was required to show it substantially complied with both the filing requirement and the posting requirement. We agree.

"Substantial compliance has been defined as 'compliance in respect to the essential matters necessary to assure every reasonable objective of the statute.'" *Brown v. Baby Girl Harper*, 410 S.C. 446, 453 n.6, 766 S.E.2d 375, 379 n.6 (2014) (quoting *Orr v. Heiman*, 12 P.3d 387, 389 (Kan. 2000)). However, there is no recognized

doctrine of substantial compliance in this context. In *Davis v. NationsCredit Financial Services Corp.*, 326 S.C. 83, 86, 484 S.E.2d 471, 472 (1997), our supreme court found a lender substantially complied with the borrower preference statute by providing the borrower the statutorily required information contemporaneously with her credit application, even though it was not contained on the first page of the application as the statute required. There, the court found the purpose of the statute was the clear and prominent disclosure of the information necessary to ascertain the relevant preferences of the borrowers. *Id.* at 86-87, 484 S.E.2d at 473. This case is distinguishable. Here, the statutory provisions at issue have a regulatory purpose. They provide filing and licensing requirements that a supervised lender must meet to operate and impose finance charges higher than 18% APR in this state. The purpose of filing a maximum rate schedule serves not only to inform consumers, it triggers the Department's oversight of the lender, which is critical to assuring the SCCPC's objectives of protecting consumers, providing rate ceilings, and fostering competition among suppliers of consumer credit.

More than 1,600 of the loans Cash Central made to South Carolina consumers exceeded 239.9% APR, and the highest rate it charged was 246%. The SCCPC allows supervised lenders to contract for and receive loan finance charges at any rate they wish so long as they meet the statutory filing and posting requirements. If the lender fails to meet such requirements, the statute prohibits it from imposing finance charges at a rate higher than 18% APR. If we were to allow substantial compliance in this context, supervised lenders would be able to charge excessive rates without ever actually meeting the statutory filing and posting requirements. Because the legislature has given supervised lenders the freedom to charge such high rates, such lenders must strictly comply with the applicable statutory provisions. We therefore conclude a defense of substantial compliance is inapplicable.

We find the circuit court erred by determining Cash Central substantially complied with sections 37-3-201 and 37-3-305. Section 37-3-305 requires a supervised lender to file a rate schedule with the Department *and* post a maximum rate schedule in a conspicuous place. It is undisputed Cash Central did not file a maximum rate schedule with the Department prior to April 2015. Because the statute requires both filing and posting, Cash Central's compliance with only one of these requirements would have been insufficient to establish the defense. Moreover, no evidence in the record supports the circuit court's conclusion that Cash Central complied with the statute's posting requirement. Jensen admitted Cash Central's website—its only place of business—did not state the maximum

APR.  Likewise, he acknowledged the fee schedule Cash Central posted did not reflect rates for $750 loans even though it offered loans ranging from $750 to $5,000.  The SCCPC evidences an intent to provide consumers with information about the maximum rate a supervised lender can charge.  A posting that does not provide the maximum rate does not achieve this purpose.  We therefore conclude that even assuming a defense of substantial compliance were applicable, the record does not support the circuit court's finding that the fee schedule posted on Cash Central's website substantially complied with the SCCPC's statutory filing and posting requirements.

## B. Section 37-3-201(6)

Section 37-3-201(6) provides:

> Notwithstanding subsection (2), if a lender can demonstrate with competent evidence that (a) any failure to post rates properly filed under [s]ection 37-3-305 or failure to properly file these rates under [s]ection 37-3-305 was a result of a bona fide error or excusable neglect, (b) the rates were properly posted or properly filed when the error or neglect was discovered or brought to the lender's attention, and (c) that no other failure to post or file rates has been brought to the lender's attention by the Department . . . or by consumers within the previous forty-eight month period, then the maximum rate of loan finance charges assessable by the lender is *the rate previously properly filed with the Department*[,] . . . provided, however, the lender that has failed or neglected to post rates or to file rates is subject to a civil penalty of up to $5,000.00 payable to the Department . . . .

(emphasis added).

The Department contends the language of section 37-3-201(6) suggests the legislature intended this statutory defense to be available only to lenders that previously properly filed a maximum rate schedule with the Department.  It argues Cash Central did not satisfy the prerequisites of section 37-3-201(6) because it never filed rates with the Department and it therefore could not avail itself of this statutory defense.  However, the Department contends that even assuming the

defense applied and Cash Central satisfied the three elements, Cash Central must roll back its contracted rates to 18% APR, in addition to paying the $5,000 penalty. Further, it asserts the circuit court erred in finding Cash Central would have to recast its loans to 0% APR as opposed to 18% APR. We agree.

We find the circuit court erred in concluding this provision excused Cash Central from refunding excess charges to consumers. The provisions of 37-3-305 are clear: to charge a rate higher than 18%, a supervised lender *must* file *and* post its maximum rate; if it fails to do so, it is not authorized to contract for or receive finance charges over 18% APR. Although section 37-3-201(6) creates an exception that allows a lender to assess finance charges at or below the rate it previously properly filed with the Department if the lender meets the requirements of subsection 37-3-201(6), Cash Central had *never* filed a maximum rate with the Department prior to 2015. Thus, there was no "previously properly filed" rate to apply, and even assuming Cash Central established its failure to post was the result of a bona fide error or excusable neglect, it was not permitted to assess charges higher than 18% APR. *See* § 37-3-201(2) (stating that a supervised lender may contract for and receive finance charges "(b) on loans with a cash advance exceeding six hundred dollars . . . any rate *filed and posted* pursuant to Section 37-3-305; *or* (c) *on loans of any amount, eighteen percent per year on the unpaid balances of principal*" (emphases added)); § 37-3-305(7) (providing that with respect to the renewal of maximum rate filings, "[i]f any creditor has not filed a maximum rate schedule with the Department . . . by the thirty-first day of January of the year in which it is due, then on this date the filing is no longer effective and the maximum credit service charge that the creditor may impose on any credit extended after that date *may not exceed eighteen percent a year*" (emphasis added)). For the foregoing reasons, the circuit court erred in concluding subsection 37-3-201(6) excused Cash Central from refunding excess charges.

## C. Section 37-5-202(7)

The Department next argues the bona fide error defense of section 37-5-202(7) is likewise inapplicable here. We agree.

Section 37-5-202(1) provides generally,

> If a creditor has violated any provisions of this title applying to . . . schedule of maximum loan finance charges to be filed and posted [under section 37-3-305] . . . the consumer has a cause of action to

> recover actual damages and also a right in an
> action . . . to recover from the person violating this title a
> penalty in an amount determined by the court not less
> than one hundred dollars nor more than one thousand
> dollars. . . .

§ 37-5-202(1).  In addition, subsection 37-5-202(2) states, "A consumer is *not obligated to pay* a charge in excess of that allowed by this title and has a right of refund of any excess charge paid."  (emphasis added).  However, subsection 37-5-202(7) provides,

> A creditor may not be held liable in an action brought
> under this section for a violation of this title if the
> creditor shows by a preponderance of evidence that the
> violation was not intentional and resulted from a bona
> fide error notwithstanding the maintenance of procedures
> reasonably adapted to avoid the error.

The Department asserts that because the defense in section 37-3-201(6) is more specific than section 37-5-202(7), section 37-3-201(6) is the only applicable statutory defense for failure to comply with the maximum rate provisions.

We find the circuit court erred in determining section 37-5-202(7) relieved Cash Central from any obligation to refund excess charges to consumers.  Section 37-5-202(7) provides a defense generally available to creditors while section 37-3-201(6) is a specific defense available to supervised lenders for the failure to file a maximum rate.  Further, if the defense contained in 37-5-202 were available for the failure to file a maximum rate, section 37-3-201(6) would be superfluous.  Thus, we find subsection 37-3-201(6) prevails over section 37-5-202.[6]  *See Criterion Ins. Co.*, 258 S.C. at 293, 188 S.E.2d at 464 ("General and special statutes should be read together and harmonized if possible.  But to the extent of any conflict between the two, the special statute must prevail.").

---

[6] The Department argues the circuit court erred in failing to defer to its 1986 administrative interpretation that the bona fide error defense of subsection 37-5-202(7) did not apply to a lender's failure to file a maximum rate.  In light of our disposition of this issue, we need not address this argument.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address an appellant's remaining issues when the disposition of a prior issue is dispositive).

Next, the Department argues the defense in subsection 37-5-202(7) is reserved for clerical errors rather than errors of law and the record failed to show Cash Central maintained procedures reasonably adapted to avoid the error.  We agree.

Subsection 37-5-202(7) does not define "bona fide error."  The Federal Truth in Lending Act contains a similar provision, which states that "[e]xamples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and program[m]ing, and printing errors, *except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error*."  15 U.S.C. § 1640(c) (emphasis added); *see also* 15 U.S.C. § 1601 (providing the purpose of the subchapter was "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices").  *Black's Law Dictionary* defines the term "bona fide" as "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine."  *Bona Fide*, *Black's Law Dictionary* (11th ed. 2019).  It defines "bona fide error" as "[a] violation that is unintentional and occurs despite procedures reasonably adapted to avoid any such error" and states it "is sometimes a defense to a technical violation of a statute that otherwise imposes strict liability."  *Error*, *Black's Law Dictionary* (11th ed. 2019) (citing 15 U.S.C. § 1640(c)).

Even assuming subsection 37-5-202(7) applies, the circuit court erred in finding Cash Central's failure to comply with subsection 37-3-305(1) was a bona fide error.  This defense requires that the violation was not intentional *and* was a bona fide error.  The circuit court found Fox—the person responsible for ensuring legal compliance—simply "forgot, due to innocent human error" to file the maximum rate schedule with the Department.  Fox testified her failure to file the schedule or realize this additional filing requirement was an "oversight."  Furthermore, Bridgette Roman, general counsel for Community Choice and Fox's direct supervisor, corroborated Fox's testimony that her compliance outline was the only written procedure Community Choice used to ensure compliance when beginning operations in a new state.  Fox acknowledged her compliance outline specifically referenced the filing and posting requirement of section 37-3-305 but admitted it did not specifically refer to the Board or the Department.  Fox testified her file included the "Initial Maximum Rate Filing Schedule for Consumer Loans" form but she did not complete or file the form at that time.  Fox stated that eight months later, when Cash Central applied for and received the license from the Board, she did not recall whether it was required to file anything else and stated that it was

"pretty easy to forget that [she] h[ad] this other piece of paper to file."  Fox was the only person who contributed to the creation of the outline, Roman acknowledged she did not review the outline to verify its completeness or accuracy, and Cash Central had no other procedure in place that required anyone to review the outline for accuracy.  In addition, Fox and Roman testified the outlines were unique to each state and there was no overarching policy governing what information was to be included in the outline.  Based on the foregoing, no evidence showed Cash Central's procedure of creating a compliance outline was reasonably adapted to avoid the errors here.  Therefore, we find the circuit court erred in finding Cash Central's failure to post and file the maximum rate schedule was a bona fide error.

Finally, we find the circuit court erred as a matter of law in concluding this defense allowed Cash Central to retain charges it obtained in excess of 18% APR.  Cash Central admitted it failed to file the maximum rate schedule with the Department.  As we stated, until it filed the maximum rate schedule, the maximum rate it was permitted to charge pursuant to the SCCPC was 18% APR.  Cash Central did not file this form until April 10, 2015.  Therefore, all finance charges over 18% APR that it collected from South Carolina consumers from the time it began making consumer loans in South Carolina until April 10, 2015, were excess charges.  Subsection 37-5-202(2) states consumers are not obligated to pay charges in excess of those allowed by the SCCPC and have a right to a refund of any excess charges paid.  We conclude this provision is a distinct remedy, independent of a consumer's right to bring an action for damages or penalties for the violation of a failure to file.  *See* § 37-5-202(1) (stating "[i]f a creditor has violated any provisions of this title applying to . . . schedule of maximum loan finance charges to be filed and posted" under section 37-3-305, a consumer has a cause of action to recover actual damages and "to recover from the person violating this title a penalty in an amount determined by the court not less than one hundred dollars nor more than one thousand dollars"); § 37-5-202(3) ("[I]f a consumer is entitled to a refund and a person liable to the consumer refuses to make a refund within a reasonable time after demand, the consumer may recover from the creditor or the person liable in an action other than a class action a penalty in an amount determined by the court not less than one hundred nor more than one thousand dollars.").  Subsection 37-5-202(2) provides "consumer[s are] *not obligated to pay* a charge in excess of that allowed by this title and ha[ve] a right of refund of any excess charge paid." (emphasis added).  The provisions of subsections 37-5-202(2) and 37-5-202(7) are mutually exclusive, and section 37-5-202(7) does not excuse Cash Central from refunding excess charges.  Nothing in these provisions require Cash Central to recast its rates to 0%; rather, they require it to refund charges in excess of 18% APR.  Therefore, we find the circuit court erred in concluding Cash Central's

failure to file was a bona fide error and that it was excused from refunding excess charges.[7]

**CONCLUSION**

For the foregoing reasons, we find the circuit court erred by concluding Cash Central was not required to refund excess charges to affected consumers, and the circuit court's order finding in favor of Cash Central is

**REVERSED.**

**KONDUROS and MCDONALD, JJ., concur.**

---

[7] We note neither party has challenged the imposition of the $15,000 penalty.